## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

**TYLER MURDOCK,** *et al.***,**
    Plaintiffs,

**v.**

**CERTAIN UNDERWRITERS AT LLOYDS, LONDON PIONEER**
    Defendant.

**Case No. 4:21-cv-1197-CLM**

## MEMORANDUM OPINION

Tyler and April Murdock ("Murdocks") own chicken houses that suffered damage of disputed origin. The Murdocks sued their insurance carrier, Certain Underwriters at Lloyds, London Pioneer ("Lloyds"), and the writer of policy, Tim Parkman, Inc. ("TPI"). (Doc. 1). The court previously dismissed all claims against TPI and all claims against Lloyds except Counts I-III. (Doc. 13). Lloyds now seeks summary judgment on Counts I-III. (Doc. 25).

For the reasons stated within, the court will **GRANT** Lloyds' Motion on Counts II-III (bad faith) and will **DENY** the Motion on Count I (breach of contract). The parties will thus try Count I on **August 26, 2024**, as further detailed in the accompanying scheduling order. (Doc. 50).

### Background

**1. The Damage**

These facts are either undisputed or presented in the light most favorable to the Murdocks, as the non-moving party. FED. R. CIV. P. 56; *see, e.g.*, *Warrior Tombigbee Transp. Co. v. M/V Nan Fung* 695 F.2d 1294, 1296 (11th Cir. 1983) ("All reasonable doubts about the facts should be resolved in favor of the non-movant.").

### A. The Insurance Policy

The Murdocks own a chicken farm. To protect their business, the Murdocks bought a Commercial Property Policy of Insurance from Lloyds. Among other things, the Policy covered wind damage:

> A. Covered Causes of Loss When Broad is shown in the Declarations, Covered Causes of Loss means the following:
>
> 4. Windstorm or Hail, but not including: …
>    a. Frost or cold weather;
>    b. Ice (other than hail), snow or sleet, whether driven by wind or not;
>    c. Loss or damage to the interior of any building or structure, or the property inside the building or structure, caused by rain, snow, sand or dust, whether driven by wind or not, unless the building or structure first sustains wind or hail damage to the roof or walls through which the rain, snow, sand or dust enters; or
>    d. loss or damage by hail to lawns, trees, shrubs or plants which are part of a vegetated roof.

The Murdocks timely paid their premiums, and the Policy was effective during the relevant events.

### B. First Windstorm (September 15, 2019)

A storm hit the Murdock's buildings around September 15, 2019. Mr. Murdock noticed pieces of tin lifted at the seams of two buildings, so he called a contractor, Complete AG Construction ("CAGC"), who noted this and other wind damage to the roofs. (Doc. 27-1 at 5). So on September 24th, the Murdocks filed a claim for wind damage through their agent, CJW and Associates ("CJW").

### 1. First Inspection (McDonald)

Lloyds retained Hal McDonald ("McDonald") of McDonald Claim Service to inspect the claim and report on the cause and extent of damage. McDonald inspected the damaged houses on October 1, accompanied by Mr. Murdock, plus Carlos and Beth Stewart of CAGC:

> **CAUSE OF LOSS**
> The insured indicated that on or about 9/15-25/2019 wind damaged the roof. The insured noticed two pieces of tin lifted up at the seam. The tin was tented along these two pieces of metal. The insured stated he was not sure about the date when he noticed the lifted seas as the roof was not leaking anywhere. He called CAGC a contractor at 256-302-4942 who sent out Carlos to inspect the roof. Beth Stewart with CAGC also came to the risk.
>
> Carlos and Beth were present during the inspection. The insured stated Carlos noted other wind damage to the roofs of house 4 and 5. He stated the roof was lifted by wind and had dips and rises along the rafter run. Carlos stated the dips or sags in the roof was from wind. The insured stated he was unaware of any wind damage other than the two tented sections of sheet metal on house 5. Mr. Murdock stated he could not state any date of loss for the sagging roof and was not sure of the date of loss for the two tented sections of metal roof on house 5.

(Doc. 27-1 at 5). As noted above, Carlos told McDonald that he believed the wind lifted the roofs, causing dips and sags. McDonald agreed that there was some wind damage to the roofs but believed that the sagging in the roofs and the walls leaning in on the front and rear of both houses was more consistent with long-term weight and settling than wind.

In a letter dated November 6, 2019, CJW, on behalf of Lloyds, told the Murdocks that McDonald inspected the homes and found that some of the claimed damage was not caused by the wind, but CJW was hiring a licensed engineer to perform an inspection before deciding whether to cover the claim. (Doc. 27-1 at 2-6).

### 2. Second Inspection (Richardson)

Lloyds authorized CJW to hire Matthew Richardson ("Richardson"), a licensed Senior Forensic Engineer employed by EFI Global, to conduct a second inspection and prepare a report. (Doc 27-3 at 2-78). Richardson inspected the two houses on November 12th. (Doc 27-2 at 3).

Richardson issued his report on December 19. In it, Richardson documented his observations, plus weather data for possible wind events between July 1, 2019, and September 30, 2019. (Doc. 27-2 at 3-4). Richardson noted that damage to structures caused by winds for structures like the Murdocks' chicken houses is shown by visible damage

to the exterior of the building and that "damage from wind forces is typically not 'hidden' or concealed by the structure." (Doc. 27-2 at 5). Richardson listed five dates of reported high winds in the area between January 1, 2017, and September 30, 2019, none of which occurred on September 15, 2019. (Doc. 27-2 at 4).

### 3. Denial & Third Inspection (Richardson follow-up)

On January 8, 2020, CJW denied coverage, citing the damage to be "more consistent with long-term weight and settling than with wind." (Doc 27-4 at 2-3). Specifically, CJW cited the McDonald and Richardson reports to find that the houses suffered from "age-related deterioration, thermal expansion and contraction of the wood, lack of maintenance and failed and inadequate trusses that caused the out-of-plumb, sagging and buckling of the buildings and the loosening of the fasteners[.]" (Doc 27-4 at 4).

The Murdocks argued that CJW could not make this finding because McDonald and Richardson only examined the *exterior* of the two houses; they did not examine the upper, interior sections or trusses. So the Murdocks called CJW to question CJW's findings and the denial of their claim. (Doc. 43-2 at 2). Richardson "agreed that a thorough inspection would involve looking at the interior of the building and the roof support structure." (Doc. 43-2 at 2).

So CJW sent Richardson back to the Murdock's farm on January 30, 2020. On February 13, 2020, Lloyds and CJW reported that Richardson stood by his original report following the re-inspection—an inspection that included the interior spaces of the two houses. (Doc. 43-2 at 3). Lloyds reissued its denial of the Murdocks' claim on February 13. (Doc. 43-2 at 4).

### C. Second Windstorm (April 12, 2020)

Another windstorm hit the Murdocks' chicken houses in April 2020. (Doc. 43-2 at 2-9; Doc. 43-4).

4

### 1. Fifth Inspection (Abubaker)

This time, the Murdocks hired their own inspector, Nila Abubakar ("Abubakar"), a structural engineer and senior consultant with Engineering Systems, Inc. Abubakar inspected the houses on July 1, 2020, and determined that the houses had suffered "[w]ind-related damage." (Doc. 27-6 at 2-12).

### 2. Sixth Inspection (Taylor)

Lloyds thus retained engineer Kelli Taylor ("Taylor") from J.S. Held, LLC to examine the houses and opine whether either windstorm damaged the houses. Taylor examined the houses on August 17, 2020 and determined that "the damage to the roof trusses within the two poultry houses was caused by mishandling of the trusses during transportation and/or erection" and that the "extent of damage to the roof trusses within Building 1" was "approximately 94 trusses (100% of the trusses)" and the "extent of damage to the roof trusses within Building 2" was "approximately 74 trusses (80% of the trusses)." (Doc. 43-2 at 2-9).

### 3. Abubakar Rebuttal

On November 4, 2022, Abubakar issued a "Supplemental Investigative Report" in which she opined that "[t]he extent of trusses designated as damaged or deficient by JS Held renders the structures not safe for use and in [her] opinion, cannot be occupied for their intended purpose. The structural integrity of the building renders then uninhabitable." (Doc. 43-4).

—

Ultimately, CJW and Lloyds stuck by the original denial, relying on the reports of McDonald, Richardson, and Taylor.

## 2. The Lawsuit

The Murdocks sued Lloyds and the writer of the policy, TPI, alleging seven counts. The court dismissed all counts against TPI and all but three against Lloyds: Breach of Contract (Count I); Normal Bad Faith (Count II); Abnormal Bad Faith (Count III). (Doc. 13).

Lloyds now seeks total summary judgment on Counts II-III and partial summary judgment on Count I—*i.e.*, judgment that it did not breach the policy when it didn't pay after the first windstorm. (Doc. 25). Lloyds does not seek summary judgment on Count I to the extent that pleads breach of contract for failure to pay after the second windstorm.

### STANDARD OF REVIEW

In reviewing a motion for summary judgment, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. *See Cuesta v. Sch. Bd. of Miami-Dade Cty.*, 285 F.3d 962, 966 (11th Cir. 2002). Summary judgment is appropriate when there is no genuine dispute of material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). But where the evidence is merely colorable or not significantly probative, no genuine dispute of material fact exists, and summary judgment is appropriate. *Id.* at 249-50. Further, if the non-movant responds to the motion for summary judgment with just conclusory allegations, the court must enter summary judgment for the movant. *Peppers v. Coates,* 887 F.2d 1493, 1498 (11th Cir. 1989).

# DISCUSSION

The court has two motions before it: Lloyds' Motion for Partial Summary Judgment, (doc. 25), and the Murdocks' alternative motion to strike the February 23, 2024, declaration of McDonald that Lloyds attached to its reply brief, (doc. 48). As for the latter, the court agrees with the Murdocks that the declaration was untimely, and Lloyds has not provided good cause to overcome its untimeliness. That said, the court will **DENY AS MOOT** the alternative motion to strike because, as explained below, the court agrees with the Murdocks that—irrespective of whether the court considers McDonald's new declaration—the Murdocks have presented enough evidence to allow a jury to find that Lloyds breached the contract by not covering damage caused by the first or second windstorm.

**Count I: Breach of Contract**

Count I alleges that Lloyds breached its contract with the Murdocks to pay for wind damage. "A contract of insurance, like other contracts, is governed by the general rules of contracts." *Twin City Fire Ins. v. Alfa Mut. Ins.*, 817 So.2d 687, 691 (Ala. 2001) (citing *Pate v. Rollison Logging Equip., Inc.*, 628 So.2d 337 (Ala. 1993)). The Murdocks can establish a breach-of-contract claim by showing "(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages." *S. Med. Health Sys., Inc. v. Vaughn,* 669 So.2d 98, 99 (Ala. 1995) (citations omitted).

Under the third element (nonperformance), Lloyds argues that the Murdocks fail to provide evidence that would allow a reasonable juror to find that the first wind event in September 2019 damaged the Murdocks' chicken houses, and thus Lloyds had no duty to pay for any damage that preexisted the second wind event in April 2020. The court disagrees.

The Murdocks first noticed the damage shortly after the September 2019 windstorm and thus called their contractor, CAGC. CAGC opined that the damage was caused by the wind—as CAGC told Lloyds' first

inspector, McDonald, when he performed his inspection. That McDonald and Richardson disagreed with Murdock and CAGC's assessment—finding instead that "age-related deterioration, thermal expansion and contraction of the wood, lack of maintenance and failed and inadequate trusses that caused the out-of-plumb, sagging and buckling of the buildings and the loosening of the fasteners" caused the roof damages—creates a genuine issue of material fact.[1] (Doc 27-4 at 4).

While the court finds it isn't necessary to create a disputed fact question, Abubaker's July 2020 opinion that wind caused the damage makes the dispute more genuine. Lloyds argues that Abubaker's opinion cannot be used to attribute damage to the first wind event (September 2019) because she didn't inspect the houses until after the second wind event (April 2020). But as the Murdocks point out, the same can be said of Lloyds' expert, Taylor, who also viewed the houses only after the second windstorm and opined that the damage was caused by mishandling of the trusses either during transport or erection.

Questions stemming from when the lay and expert witnesses viewed the house, and what parts of the houses they viewed—*e.g.*, McDonald and Richardson viewing only the exterior of the houses—go to weight and credibility. Those are questions for the jury at trial, not this court at summary judgment.

In short, at trial, the Murdocks can argue that either or both windstorms caused the damage and thus Lloyds had a contractual duty to cover the damage.

**Counts II-III: Bad Faith**

Under Alabama law, bad-faith insurance is a single tort with two methods of proof: (1) bad-faith failure to pay, and (2) bad-faith failure to investigate. *See State Farm Fire & Cas. Co. v. Brechbill*, 144 So. 3d 248, 257–58 (Ala. 2013). The Murdocks plead both methods as distinct counts:

---

[1] Whether CAGC employees are qualified to render an expert opinion at trial is a question for motions in limine. (*See* Doc. 39) (listing as Beth Stewart of CAGC and other witnesses identified during discovery as possible trial witnesses).

bad-faith failure to pay, a.k.a "normal bad faith", in Count II, and bad-faith failure to investigate, a.k.a. "abnormal bad faith," in Count III. (Doc. 1, ¶¶ 40-55).

While they share different names, the two methods share four common elements—with bad-faith failure to investigate adding a fifth:

| **Failure to Pay** | **Failure to Investigate** |
|---|---|
| The insurer breached an insurance contract between the parties; | The insurer breached an insurance contract between the parties; |
| The insurer intentionally refused to pay the insured's claim; | The insurer intentionally refused to pay the insured's claim; |
| The insurer had no reasonably legitimate or arguable reason to refuse to pay; | The insurer had no reasonably legitimate or arguable reason to refuse to pay; |
| The insurer **knew** that it had no reasonably legitimate or arguable reason to refuse to pay; and, | The insurer **knew** that it had no reasonably legitimate or arguable reason to refuse to pay; and, |
|  | The insurer intentionally failed to determine whether there was a legitimate or arguable reason to refuse to pay the claim. |

*Brechbill,* 144 So. 3d at 258. Because these distinct theories share four common elements, Lloyds only needs to show that the Murdocks fail to present sufficient evidence on one of the four common elements to be entitled to summary judgment on Counts II *and* III. The court finds that no reasonable juror could find that Lloyds had no reasonably legitimate or arguable reason to deny the Murdocks' claim, so Lloyds is entitled to summary judgment on Counts II and III.

    1. *Alabama law*: Alabama law requires the insured to eliminate any arguable reason propounded by the insurer for refusing to pay the claim. *Shelter Mut. Ins. v. Barton,* 822 So.2d 1149, 1154 (Ala. 2001). Put another way, the Murdocks must show that they are entitled to a directed

verdict on the breach-of-contract claim in order to have the claim of bad faith submitted to a jury. *Emps. Benefit Ass'n v. Grissett*, 732 So.2d 968, 976 (Ala. 1998). "Ordinarily, if the evidence produced by either side creates a fact issue with regard to the validity of the claim and, thus, the legitimacy of the denial thereof, the [bad-faith] claim must fail and should not be submitted to the jury." *Nat'l Sav. Life Ins. v. Dutton*, 419 So.2d 1357, 1362 (Ala. 1982).

As you can see, this is a very insurer-friendly standard. In fact, "to defeat a bad faith claim, the defendant does not have to show that its reason for denial was correct, only that it was arguable." *Liberty Nat. Life Ins. v. Allen*, 699 So.2d 138, 143 (Ala. 1997).

2. *Application*: Lloyds' reason for denial is at least arguable. As explained, Lloyds relies on three expert opinions (McDonald, Richardson, and Taylor), two written by engineers (Richardson and Taylor). While the Murdocks point out that McDonald and Richardson's initial opinions, and thus Lloyds' original denial, came without viewing the interior of the houses, both engineers (Richardson and Taylor) ultimately inspected the interior of the houses and still found that wind did not cause the damage. So any negligence or wantonness that may have arisen from the first two inspections does not irreversibly taint the final opinions that Lloyds relies on to fight against the breach-of-contract claim.

As the court found in Count I, there is a genuine issue of material fact about what damaged the Murdocks' chicken houses. The jury could find that it was the wind, or they could believe Lloyds' experts that say it wasn't. If the facts are presented at trial as they have been at the summary judgment stage, neither party will be entitled to a directed verdict on breach of contract. Under Alabama law, that means that the Murdocks cannot prove bad faith under either method of proof. *See Grissett*, 732 So.2d at 976; *Dutton*, 419 So.2d at 1362. So the court must grant summary judgment on Counts II and III.

## CONCLUSION

For these reasons, the court **DENIES as MOOT** the Murdocks' Alternative Motion to Strike. (Doc. 48). The court **GRANTS in part** and **DENIES in part** Lloyds' Motion for Partial Summary Judgment. (Doc. 25). The court will enter a separate order granting judgment for Lloyds on Counts II and II.

The parties will proceed to trial on Count I. The court will enter another separate order that sets out the trial date and associated deadlines. (Doc. 50).

**DONE** and **ORDERED** on June 27, 2024.

_____
**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE